1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3   JULIE SHERIDAN,                              Case No.: 2:20-cv-00126-APG-DJA

4          Plaintiff                      **Order Granting Defendant's Motion for**
                                          **Summary Judgment and Denying**
5   v.                                    **Plaintiff's Motion for Partial Summary**
                                          **Judgment**
6   CAESARS ENTERPRISE SERVICES LLC,
                                              [ECF Nos. 39, 43]
7          Defendant

8          Plaintiff Julie Sheridan sues her former employer, defendant Caesars Enterprise Services

9   LLC, for breach of an employment contract.  Sheridan alleges that Caesars did not have cause to

10  fire her as that term is defined in the contract, and she therefore is entitled to a severance

11  payment for termination without cause.  The parties each move for summary judgment.  Caesars

12  argues there is no genuine dispute that it reasonably believed it had cause to terminate Sheridan

13  following a night of "drunken shenanigans" during a corporate-sponsored team meeting in Las

14  Vegas. ECF No. 39 at 2.  Sheridan argues that Caesars never gave her a reason for her

15  termination at the time, and its post hoc explanations do not justify her termination for cause as it

16  is defined in the parties' written contract.  I grant Caesars' motion and deny Sheridan's motion

17  because no reasonable jury could find that Caesars breached the employment contract.

18  **I.  BACKGROUND**

19      **A.  The Contract**

20          In 2017, Sheridan and Caesars entered into an employment contract with a three-year

21  term. ECF No. 40-1.  Caesars could terminate Sheridan without cause but would have to pay her

22  a severance if it did so. *Id.* at 2, 8-9.  Under section 9(b) of the contract, Caesars could terminate

23  Sheridan without paying severance if it had "reasonable belief" that Sheridan "committed an act

1  (or has failed to act in a manner) which constitutes Cause." *Id.* at 7.  As relevant here, section

2  9(b) defined cause to include:

3          B.  Employee's failure to responsibly manage complimentary expenses
        entrusted to the Employee, as determined in the reasonable exercise of discretion
4        by the Company;
            C.  any act of willful or gross misconduct, insubordination or dishonesty
5        on the part of the Employee which causes or threatens to cause harm to the
        Company or any of its affiliates, as determined in the reasonable exercise of
6        discretion by the Company;
            D.  the use by Employee of illegal drugs, non-prescribed controlled
7        substances, and/or the abuse of legally-prescribed controlled substances or the use
        of alcohol to an extent that it interferes with the performance of Employee's
8        duties under this Agreement, as determined in the reasonable exercise of
        discretion by the Company;
9            . . .
            H.  a breach by Employee of any material provision of this Agreement, . . .
10       or of the rules contained in the Company's Employee Handbook or Code of
        Conduct, departmental rules and procedures, or other Company rules and
11       regulations.

12 *Id.* at 7-8.

13          Caesars' code of conduct provided that the company typically used a progressive

14 discipline process, but it warned employees that "violations of more than one Conduct

15 Standard in a single act will result in increased or multiple disciplinary steps up to and

16 including immediate separation." ECF No. 40-6 at 2.  It also advised employees that

17 "some misconduct or performance may be so severe that the Company may issue a Final

18 Written Warning or Separation of Employment upon the first offense without prior

19 progressive discipline." *Id.*  The list of conduct standards included not using "obscene or

20 profane language . . . with intention or desire to harm another." *Id.*  It advised employees

21 to be "honest and forthcoming in all communication," and to not knowingly "omit

22 pertinent information, particularly regarding investigations or reports." *Id.*  It required

23 employees not to violate Caesars' alcohol policy. *Id.* at 3.  And it advised employees to

2

1   "use professional judgment and . . . refrain from acts of gross misjudgment, carelessness,

2   [and] negligence in the performance of one's job." *Id.*

3        Caesars' alcohol policy stated that "occasionally, alcohol is served at social events

4   sponsored by the Company.  Only the moderate and limited use of alcohol is acceptable.

5   [Employees] are expected to remain responsible, professional and sober at all times."

6   ECF No. 41-13 at 3.

7        **B.  Events Leading Up to Termination**

8        Sheridan was employed as Director of Strategic Account Management (SAM).

9   ECF No. 40-1 at 2.  Sheridan arranged for a SAM team meeting in Las Vegas for August

10  5-8, 2019. ECF No. 40-2 at 11-12.  The meeting was a corporate event and Caesars paid

11  the expenses through complimentary expenses charged to the participants' rooms. *Id.* at

12  15, 39; ECF No. 40-7 at 3-4.

13       On August 7 around 5:20 p.m., the team gathered for dinner at a restaurant called

14  Burro Borracho at the Rio, which is a Caesars property. ECF No. 40-2 at 15.  There were

15  14 team members at the dinner and 43 drinks were ordered, including 14 shooters of

16  Fireball whisky. ECF No. 40-3 at 27, 29.  Sheridan charged the dinner and drinks to her

17  room. *Id.* at 27; ECF No. 41-3.

18       After dinner, the team went to a comedy show then to the Lobby Bar at the Rio.

19  ECF No. 40-3 at 16.  At approximately 8:53 p.m., Sheridan was photographed in the

20  Lobby Bar with a bottle of Fireball whisky in her mouth. ECF Nos. 40-2 at 13, 16; 41-1

21  at 2.  The bottle still had the cap on, so Sheridan was not drinking the whisky in this

22  photo. ECF No. 40-2 at 13-14.  Sheridan explained that some of her team members were

23  formerly associated with a different team at Caesars known as In Market East or IME. *Id.*

at 14.  Sheridan believed that IME had a tradition or inside joke related to drinking Fireball out of the bottle, so she was pretending to do the same as part of a team building exercise. *Id.* at 14, 16, 30, 35-36.  The picture was taken by team member Steve Ramey, who then sent it to other SAM and IME team members. *Id.* at 14.  Ramey charged 11 alcoholic beverages from the Lobby Bar to his room. ECF Nos. 40-3 at 28; 41-4; 41-5.  It was against policy for employees to charge alcohol to their rooms. ECF No. 40-8 at 3-4.

Sheridan and some of the SAM team members later gathered at the lobby bar in the Cromwell hotel, another Caesars property. ECF No. 40-2 at 28, 45.  At this bar, at approximately 9:49 p.m., Sheridan took a bottle of Fireball from the bartender and posed for a video in which she pretended to take a shot from the Fireball bottle. *Id.* at 28-30; ECF No. 42 (manually filed Ex. 11).  She states that she did not drink any whisky, though, because she put her tongue on the bottle opening so that no liquid would go into her mouth. ECF No. 40-2 at 35.  In the video, Sheridan stated "Fuck IM East." ECF No. 43-5 at 38-39; ECF No. 42 (manually filed Ex. 9).  That video was posted to a group chat that was viewable by 24 other employees in the IME team. ECF No. 43-5 at 38.  Sheridan thereafter poured eight shots of Fireball out of the same bottle she had just put to her mouth. ECF Nos. 40-2 at 37-8; 42 (manually filed Ex. 16).

Sheridan offered shots to the bartenders, who declined. ECF Nos. 40-2 at 43-45; 42 (manually filed Ex. 17).  Sheridan explained that offering shots to the bartenders was just "in fun," and she had "no expectations the bartenders would do a shot" while working. ECF No. 40-2 at 45.  Caesars' bartenders are not allowed to drink while working. *Id.* at 45-46.

Sheridan also sent drinks to two other team members who were sitting a short distance away in the same bar. ECF No. 40-3 at 3-4.  One of those team members flipped off Sheridan, who returned the gesture. ECF Nos. 40-3 at 4-6; 42 (manually filed Ex. 18).  Sheridan stated it was all in good fun and not insubordinate behavior that she needed to address. ECF No. 40-3 at 7-8.

At approximately 10:38 p.m., Sheridan closed out the bill at the bar by charging everything to her room. ECF No. 40-3 at 11-12.  The bill included 22 alcoholic beverages. *Id.* at 30-31; ECF No. 41-6.  According to one of the Cromwell bartenders, the SAM group was lively but not overly intoxicated.[1] ECF No. 43-9 at 16.

After closing out the bill, Sheridan went to her room. ECF No. 40-3 at 15.  At that time, another team member, Katie Aznarez, also went back to her own room and rode in the elevator with Sheridan. ECF Nos. 40-4 at 29; 41-8.  Sheridan thought Aznarez was a bit intoxicated at that time. ECF No. 41-8 at 4.  But Sheridan was not concerned about what happened that night up to the time she went to bed because it was "not distinctly different than other Caesars sales events that [she] had attended." ECF No. 40-4 at 21.

Unbeknownst to Sheridan, Aznarez later left her room and rejoined some of her co-workers. ECF No. 43-6 at 33.  At approximately 11:52 p.m., a guest at the Cromwell called the front desk out of concern about an intoxicated female being taken to her room by a male. ECF No. 41-7 at 3.  In response to the call, security officers went to Aznarez's room and initially there was no response to their knocking. *Id.*  But eventually a male, who turned out to be Ramey, answered the door. *Id.*  Aznarez was on the bed, unclothed

---

[1] That bartender was later disciplined in relation to this incident for allowing Sheridan to take the bottle of Fireball because it was against policy for the bartender to give a customer a bottle and have the customer serve shots. ECF Nos. 43-6 at 83-84; 43-9 at 17.

1  and lying under a sheet. *Id.*  She had vomit on her and smelled of alcohol. *Id.*  Aznarez

2  was unresponsive, so security and responding emergency medical technicians called an

3  ambulance and Aznarez was transported to the hospital at about 12:40 a.m. *Id.* at 3, 5.

4      At approximately 1:30 a.m., Ramey attempted to get access to Aznarez's room,

5  stating he would take her belongings (presumably, some clothes) to the hospital, but

6  security denied his request. *Id.* at 3.  Instead, Security asked Ramey to identify the leader

7  of his group, and Ramey identified Sheridan. *Id.*  Security advised the front desk that only

8  Sheridan would be allowed access to the room once contact was made with her. *Id.*

9      Security attempted to contact Sheridan without success until approximately 2:18

10 a.m. *Id.*; ECF No. 41-8 at 4.  Sheridan told security that she would address the situation in

11 the morning, including obtaining Aznarez's clothes. ECF No. 41-7 at 3.  Sheridan then

12 noticed she had missed calls from SAM team members Lisa Laskey and Ramey. ECF

13 Nos. 41-8 at 4; 41-9 at 2.  Sheridan spoke to Ramey, who told her that he, Laskey, and

14 another SAM team member, Erica Ruiz, were at the hospital with Aznarez, who was fine

15 and would be returning to the hotel with the three other team members. ECF Nos. 41-8 at

16 4; 41-9 at 2.  Sheridan then advised the front desk and security that Ruiz, Laskey, Ramey,

17 and Aznarez would be returning and that they should be allowed access to Aznarez's

18 room when they arrived. ECF No. 41-9 at 2.

19     The next morning, Sheridan spoke to Ramey again, who advised her that

20 everyone, including Aznarez, would be attending the meeting scheduled for that morning.

21 ECF No. 41-8 at 4.  Aznarez also called Sheridan to state she was coming to the meeting.

22 *Id.*  Aznarez told Sheridan that she thought she might have been drugged, although no

23 drugs were found in her system. *Id.*; ECF No. 43-6 at 51.  At the meeting that morning,

1  Sheridan discussed the prior night's events with the team and admonished the team

2  members for not sticking together and having more than one person escort Aznarez to her

3  room. ECF Nos. 41-8 at 4; 41-9 at 3.

4      Sheridan spoke with her manager, Lisa Messina, on August 8 and the morning of

5  August 9. ECF Nos. 41-9 at 3; 41-15 at 2, 6; 43-4 at 20, 113-14.  According to Sheridan,

6  Messina was not concerned about Sheridan's actions, but Messina agreed with Sheridan

7  that Sheridan should reach out to Human Resources about the incident. ECF Nos. 40-4 at

8  41; 43-4 at 20-21.  On August 9, Sheridan emailed Messina and Human Resources

9  Manager Catalina Dubbs to provide her version of the events from August 7 and 8. ECF

10  No. 41-9.  In that email, Sheridan stated that many team members had shots and drinks

11  that night, but that she did not see Aznarez drinking excessively. *Id.*

12      Dubbs investigated the events of August 7-9. ECF Nos. 41-11; 43-7 at 7-8.  She

13  interviewed Aznarez, Laskey, Ruiz, Ramey, and Sheridan. ECF No. 41-11.  She also

14  reviewed video surveillance at each of the properties. ECF No. 43-6 at 82.  The

15  surveillance videos do not show how many alcoholic beverages each person consumed.

16  ECF Nos. 40-8 at 8; 43-2 at 21; 43-8 at 19.

17      On August 14, Sheridan met via Zoom with Dubbs and Mario Heidke, who was

18  then the Director of Corporate Human Resources. ECF Nos. 40-7 at 4; 43-7 at 7.  During

19  that meeting, they discussed the drinking that took place, and Heidke expressed his

20  concern about Sheridan's management of her team given that she bought drinks, set the

21  tone that heavy drinking was acceptable, and encouraged drinking. ECF Nos. 40-4 at 33-

22  38; 41-8 at 8; 43-4 at 167; 43-7 at 61-62.  During the meeting, Heidke suspended

23  Sheridan pending an investigation. ECF Nos. 40-4 at 37-38; 41-8 at 9.

Sheridan was terminated the next day by Chief Sales Officer Michael Massari, Messina, and Dubbs. ECF Nos. 40-4 at 38, 68; 41-14; 43-2 at 7.  Massari told Sheridan that she was being terminated for her behavior at the Rio and Cromwell, including that she was a leader who drank whisky out of a bottle at a bar and set a poor example. ECF No. 41-14 at 2; *see also* ECF No. 43-2 at 17 (Massari testifying that the gist of what he told Sheridan was that a leader at Caesars cannot "drink to excess, . . . do shots at the bar, . . . convince a bartender to give you the bottle and drink out of it with the team till late into the evening").  Sheridan disagreed with the decision and requested that this incident be considered in the overall context of her prior record with the company. ECF No. 41-14.  Dubbs sent Sheridan an email the next day confirming that Sheridan's separation from Caesars was involuntary and that Sheridan "will not be recommended for rehire." ECF No. 41-10.

Other attendees of the meeting were also disciplined. ECF Nos. 40-4 at 38; 41-11. Ramey was terminated. ECF Nos. 41-11; 43-6 at 47.  Aznarez was suspended pending an investigation, which prompted her to resign. ECF Nos. 41-11; 43-6 at 47.  Laskey and Ruiz were also suspended pending investigation and disciplined. ECF Nos. 41-11; 43-6 at 89.  Additionally, "[e]very SAM team member was documented as a result of the August 7 event." ECF Nos. 41-15 at 3; 43-6 at 70-71.

Based on her termination, Sheridan brings a single claim for breach of contract. She contends that Caesars did not have cause to terminate her as that term is defined in the contract.  Caesars argues it need only have reasonably believed it had good cause, and it did given Sheridan's actions in charging numerous alcoholic beverages to her room; failing to be honest and forthcoming in the investigation; and setting a poor example for

her subordinates by drinking from the bottle, doing shots, cursing on the video, and fostering an atmosphere that encouraged heavy drinking.

## II. ANALYSIS

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

Under Nevada law, an employer may a discharge an employee under an employment contract "for just or good cause" so long as its decision is not "for any arbitrary, capricious, or illegal reason" and is "based on facts (1) supported by substantial evidence, and (2) reasonably believed by the employer to be true." *Sw. Gas Corp. v. Vargas*, 901 P.2d 693, 701 (Nev. 1995).  The employer is "the ultimate finder of facts" unless the employer contractually agreed to allow "some other arbiter" to review its decision. *Id.* at 700.  However, the employer's decision must

be consistent with the employment contract, which "may subject an employer's termination authority to relevant policy provisions defining or limiting the term good cause, or to defined procedures that the employer must follow prior to termination." *Id.* (internal quotation marks omitted).

The parties' contract unambiguously assigned ultimate fact-finding authority to Caesars. Section 9(b) states that Caesars may terminate Sheridan "[u]pon reasonable belief by the Company that Employee has committed an act (or has failed to act in a manner) which constitutes Cause." ECF No. 40-1 at 7.  Additionally, the contract defined "cause" in a manner that allowed Caesars to determine in the "reasonable exercise of [its] discretion" whether an employee failed to responsibly manage complimentary expenses, engaged in gross misconduct or dishonesty, or used alcohol to the extent it interfered with the employee's duties. *Id.* at 7-8. Consequently, the question is whether a reasonable jury could find that Caesars' decision to terminate Sheridan was for any arbitrary, capricious, or illegal reason; was not supported by substantial evidence; or was not reasonably believed by Caesars to be true.

No one at Caesars documented the specific provisions of Sheridan's contract that Caesars believed she violated. ECF Nos. 43-6 at 29-30; 43-7 at 16-17.  Sheridan was not told at the time of termination what specific provisions she violated. ECF Nos. 43-6 at 61; 43-7 at 15-16.  At their depositions in this case, Dubbs and Heidke testified that they believed Sheridan violated sections 9(b)(i)(B), (C), (D), and (H) of the contract.

**A.  Subsection B: Complimentary Expenses**

Dubbs testified she believed Sheridan violated subsection B of the employment contract regarding managing complimentary expenses because several team members stated that Sheridan told them that they could charge alcohol to their room even though that was against company

policy. ECF Nos. 40-8 at 3-4; 43-7 at 16-17.  Dubbs and Heidke also believed Sheridan had

authorized excessive charges for alcohol during the night, although Dubbs acknowledged there is

no specific dollar amount that qualifies as excessive. ECF Nos. 40-8 at 3-4; 43-7 at 19.

According to Dubbs, employees who charge unauthorized items to their room may be disciplined

if the conduct was intentional or made to pay back the charges if it was inadvertent. ECF No. 43-

6 at 28-9.  Sheridan was aware of instances where complimentary expenses were reviewed and

an employee was made to pay back unapproved expenses. ECF No. 40-4 at 49.

Even viewing the facts in the light most favorable to Sheridan on Caesars' motion for

summary judgment, Sheridan has failed to point to evidence from which a reasonable jury could

find that Caesars' decision to rely on this contractual provision was arbitrary, capricious, or

illegal.  Nor has Sheridan pointed to evidence from which a jury could find Caesars' decision

was not supported by substantial evidence or that Caesars did not reasonably believe Sheridan

violated this contractual provision.  Although Sheridan notes that on other occasions employees

have been allowed to repay unauthorized charges rather than be terminated, she has not

presented evidence to show those employees were similarly situated to her.  Sheridan charged 43

alcoholic beverages totaling over $500 to her room and, according to Dubbs, other employees

stated that Sheridan authorized them to do so as well despite company policy prohibiting that.

The contract vests in Caesars the determination, in its reasonable discretion, as to what

constitutes a failure to responsibly manage complimentary expenses.  Sheridan has not raised a

genuine dispute that Caesars' decision was anything but a reasonable exercise of its discretion

based on undisputed evidence of Sheridan's charged expenses.

/ / / /

/ / / /

**B.  Subsections C, D, & H: Gross Misconduct, Dishonesty, & Alcohol Use**

Heidke believes Sheridan engaged in misconduct under subsections C and D of the contract by taking a bottle of alcohol from the bartender and then drinking it and cursing in the video. ECF No. 43-7 at 21, 25-26.  Dubbs likewise believed that Sheridan's use of alcohol interfered with her performance as a leader and her ability to make good judgment calls with her team.[2] ECF No. 43-6 at 41-42.  Massari believed that, based on the video surveillance, "everybody drank to excess." ECF No. 43-2 at 17.  He also thought Sheridan failed to set an example as a leader by doing shots, taking a bottle from the bartender and drinking from it, and staying out late partying with her team. *Id.* at 17-19.

It is not uncommon for alcohol to be served at Caesars corporate events. ECF Nos. 43-5 at 17-18, 32; 43-2 at 31, 38-39.  Caesars had experienced incidents related to excessive alcohol consumption prior to August 2019 that led it to conduct additional training on acceptable conduct as it relates to alcohol at work functions. ECF Nos. 43-6 at 86; 43-5 at 16-20, 41.  Specifically, Massari "made a point to [the] leadership team that . . . [they] had a role to play as leaders and [to] set an example . . . ." ECF No. 43-5 at 41; *see also* ECF No. 43-2 at 23-24 (Massari testifying that Caesars' policy at meetings was that employees cannot "drink to excess" and that supervisors must "[u]nderstand that leadership casts a large shadow and people follow [their supervisors'] lead").  Sheridan

---

[2] Dubbs believed Sheridan violated subsection C for the additional reason that Sheridan was dishonest and not forthcoming during the investigation.  Specifically, Sheridan stated she did not think Aznarez had been drinking excessively, but as a result of the overall investigation, Dubbs thought Aznarez was not sober "well before [Sheridan] took [Aznarez] to [Aznarez's] room." ECF No. 43-6 at 30-37.  Additionally, Dubbs believed that Sheridan withheld information about the amount of drinking that took place that night and about Aznarez being unclothed in her room with Ramey. *Id.* at 84-86.

1   attended one of those training sessions. ECF No. 43-6 at 86-87.  Another employee who

2   attended with Sheridan stated that "it was understood that anything more than two drinks

3   was not acceptable." ECF No. 43-5 at 29-30, 39.  Massari explained to employees that

4   they should limit themselves to "just a couple drinks" and should not stay out too late.

5   ECF No. 43-2 at 24.  Massari also explained that shots were "prohibited." *Id.*  However,

6   the alcohol policy was not changed to specifically state that drinks were limited to two or

7   that shots were prohibited. *Id.*; *see also* ECF No. 43-7 at 20-21 (Heidke testifying that

8   Caesars does not have a policy on the specific number of drinks someone can consume at

9   a corporate event).

10          Even viewing the facts in the light most favorable to Sheridan on Caesars' motion,

11   Sheridan has failed to point to evidence from which a reasonable jury could find that Caesars'

12   decision to rely on these contractual provisions was arbitrary, capricious, or illegal.  Nor has

13   Sheridan pointed to evidence from which a jury could find Caesars' decision was not supported

14   by substantial evidence or that Caesars did not reasonably believe Sheridan violated these

15   contractual provisions.  Caesars investigated the event by reviewing surveillance video showing,

16   among other things, Sheridan taking the bottle from the bartender, putting it to her mouth, then

17   pouring shots for her team members, and offering drinks to the bartenders.  Caesars also

18   interviewed multiple employees about what transpired over the course of the evening and the

19   following days.  Following this investigation, three different senior Caesars employees agreed

20   that Sheridan violated her contract.

21          The contract vests in Caesars the determination, in its reasonable discretion, as to what

22   constitutes the use of alcohol to the extent it interferes with the employee's job performance.

23   Massari, Heidke, and Dubbs determined that after Sheridan had received training on appropriate

1 | alcohol consumption at corporate events, Sheridan breached the contract by creating an
2 | atmosphere where excessive alcohol consumption was encouraged, thus interfering with her
3 | ability to lead by example, and culminating in a serious incident involving two of her team
4 | members.  Sheridan has not raised a genuine dispute that Caesars' decision was anything but a
5 | reasonable exercise of its discretion based on its investigation.

6 | **C. Summary**

7 | At bottom, Sheridan simply disagrees with Caesars' decision to terminate her
8 | instead of considering lesser discipline based on her overall record with the company.
9 | But that does not raise a genuine dispute whether Caesars breached the employment
10 | contract.  No reasonable jury could find that Caesars' decision to terminate Sheridan was
11 | arbitrary, capricious, or illegal, or that Caesars did not have a factual basis for its decision
12 | that it reasonably believed to be true.  Consequently, I grant Caesars' motion for
13 | summary judgment and deny Sheridan's motion.

14 | **III.  CONCLUSION**

15 | I THEREFORE ORDER that plaintiff Julie Sheridan's motion for partial summary
16 | judgment **(ECF No. 43) is DENIED**.

17 | I FURTHER ORDER that defendant Caesars Enterprise Services LLC's motion for
18 | summary judgment **(ECF No. 39) is GRANTED**.

19 | I FURTHER ORDER the clerk of court to enter judgment in favor of defendant Caesars
20 | Enterprise Services LLC and against plaintiff Julie Sheridan, and to close this case.

21 | DATED this 27th day of September, 2021.

22 |

23 |

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

14